Filed 10/21/20 In re I.G. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re I.G. et al., Persons Coming Under the Juvenile Court Law. | B305490 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALLAN G.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. 19CCJP07457) |

APPEAL from orders of the Superior Court of Los Angeles County, Steff R. Padilla, Judge. Affirmed.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Principal Deputy County Counsel, Stephen D. Watson, Deputy County Counsel for Plaintiff and Respondent.

_____

Allan G. (father) appeals the juvenile court's order declaring his three children dependents under Welfare and Institutions Code section 300, subdivision (b)(1).[1] Father contends there is insufficient evidence to support the court's order, while the respondent Los Angeles County Department of Children and Family Services (Department) contends the findings and orders are supported by substantial evidence. We affirm.

---

[1] Further statutory references are to the Welfare and Institutions Code unless stated otherwise.

2

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Father and B.G. (mother)[3] have three children:  I.G. (daughter) was born in June 2006; Carlo G. was born in March 2009, and Samuel G. was born in February 2012.  The family has lived with paternal grandparents for around 13 years.  In February 2019, mother was diagnosed with cancer; she moved in with maternal grandmother a few months later.  Daughter stayed with mother, and the boys stayed with father.  Father is not allowed at maternal grandmother's home.

*Referral and initial investigation*

The Department received a referral following an argument between mother and father the evening of Friday, October 11, 2019.  The caller reported that the argument lasted about an hour, father was yelling, and mother and children were crying.  Law enforcement was contacted, but father was grabbing the children and telling them to get inside the house, and law enforcement did not respond

---

[2] For the present summary, consistent with the substantial evidence standard of review, "we state the facts in the manner most favorable to the dependency court's order."  (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1448, fn. 1.)

[3] Mother is not a party to this appeal.

because the family was already inside. While the caller did not see father grab mother, someone mentioned witnessing father do so. The caller described father as controlling, with a "machismo" type of attitude. According to the caller, father has told the children, "If you guys leave, you'll never see me again," and made statements that perhaps he was better off dead. The caller also suspected father used marijuana and some other substance, stating that father would come home very late two or three times a week. The caller reported that mother is being treated for cancer, and students at the children's school report the children's appearance and cleanliness has declined in the last three or four months.

In the last half of October 2019, the social worker interviewed mother, father, the three children, and paternal grandparents. Mother had learned of father's infidelity about a year and a half earlier, and was diagnosed with breast cancer in early 2019. Mother moved in with maternal grandmother in May 2019, after her doctor warned her about the risks of living in a home with 13 other people. Mother had a blood infection two weeks earlier, and after father made a scene, maternal grandmother told him he was no longer welcome. Mother acknowledged that she remained at maternal grandmother's home more for marital reasons than medical ones. Father reported feeling lost without mother being there, but he had started counseling about a month earlier. Father reported that he and mother had disagreements about which parent the children would stay with, and the incident on October 11, 2019, occurred because

mother wanted to take the boys to stay with her at maternal grandmother's home and had accused father of brainwashing the boys to not want to stay at maternal grandmother's home. Both parents denied that father grabbed mother on the night of the incident that triggered the Department's investigation, and they both denied any physical abuse in their relationship.

Responding to questions about drug use, father admitted using methamphetamine "off and on" for 13 years, but claimed he had not used in the past two months, and was never a regular user. He admitted to using marijuana, but said he was trying to decrease his use. Mother admitted using methamphetamine once when she was 21 years old, and again for about a year, 18 months ago, when she learned of father's infidelity. She chose not to be around father because he was still using and she knew it would be a temptation. She had not used since being diagnosed with breast cancer in early 2019. Both parents agreed to drug test, and both tested positive for marijuana.

Mother described father as emotionally manipulative, reporting that father told the boys she had abandoned them, and that father has previously threatened to kill himself if mother leaves. Mother said that despite father's drug use and his emotional manipulation, he is a good father who would not hurt his children.

Paternal grandparents and the children denied any physical violence between the parents. The children appeared clean and appropriately dressed. Daughter

wanted counseling support because of her mother's cancer diagnosis and mother's decision to move out; daughter reported that mother had signed a form permitting counseling, but father would not. Daughter reported parents had been arguing more recently, yelling, screaming and cursing, usually about money. Daughter said father was depressed and was not working, but she had no concerns about the boys' safety with him.

On October 23, 2019, the social worker assisted mother and father with a visitation plan and a safety agreement under which neither parent would be with the children if they were under the influence, and father agreed not to drive the children because he did not have a valid driver's license. The parents agreed to give the boys the choice of sleeping at either home, and both parents would honor the boys' decision. On October 28, 2019, father enrolled in a drug and alcohol program, and the social worker gave mother resource referrals.

*Further investigation and petition*

On November 5, 2019, when Samuel chose to sleep at mother's home, father became upset and demanded that Samuel return to father's home. Mother refused, and father threatened to call the police. Mother kept Samuel home from school on November 6, 2019, because he was afraid father would be angry with him. The social worker spoke separately with each parent that day, describing them as

6

"heated, upset and emotional."  Father accused the social worker of being biased and not upholding the agreement made by the parents.  The social worker scheduled a child and family team (CFT) meeting.

Just before the CFT meeting on November 13, 2019, mother served father court paperwork in a family law court case, seeking sole custody of the children, child and spousal support, and other relief.  The declaration supporting mother's request for custody stated that father refused to allow the boys to stay with mother in an effort to use the children to persuade mother to return to the family home and not proceed with dissolution of the marriage.  Mother stated in her declaration that father "has a temper and has demonstrated that temper during our marriage and in the presence of our children.  [Father] has punched a hole in the wall, has punched a car windshield and has yelled at me in front of the children.  When [father] becomes angry or upset, he threatens to kill himself.  I believe this behavior is causing stress to our children and is one of the reasons that I cannot continue to be married to [father.]"

The social worker interviewed the children a second time in November 2019.  Daughter refused to visit with father without supervision, admitting to emotional trauma and manipulation, but denying emotional abuse.  The boys reported being frustrated and confused about visits, and the social worker reported that the children are being exposed to strong emotionally charged situations as a result of the parents' ongoing marital and custodial conflicts.  Samuel's

7

teacher observed him to be sad and believed the home environment was impacting his ability to focus. Daughter's guidance counselor reported daughter was enduring ongoing stress stemming from mother's diagnosis and the family conflict.

Based on the family's situation, the Department recommended that the children remain in parental custody, but that the court provide ongoing supervision to ensure parents completed necessary programs and classes in an attempt to minimize any ongoing concerns for the children.

On November 19, 2019, the Department filed a petition with allegations under subdivisions (a) and (b) of section 300 (counts a-1 and b-4) based on father's "violent assaultive behavior in the children's presence," specifically the prior incidents where father punched a hole in the wall at the family home and when he struck a car windshield with his fists. Additional allegations under section 300, subdivisions (b)(1) and (c) were based on drug use by mother and father (counts b-1 and b-2), father's mental and emotional problems (count b-3), and emotional abuse by the father, by involving the children in the parents' marital conflict (count c-1).

*Jurisdiction and Disposition Report*

In its January 22, 2020 report, the Department stated that the custody hearing previously noticed by mother did not go forward because the parents had reconciled and were living together again. A search of father's criminal history

8

showed he had prior convictions for disorderly conduct, driving on a suspended license, and burglary, as well as a 2016 bench warrant, which was no longer active.

A social worker interviewed both parents, all three children, paternal grandfather, and a paternal aunt in early January. Attempts to contact a different paternal aunt and maternal grandmother were unsuccessful.

Regarding the allegation that father had punched a hole in a wall, neither Carlo nor Samuel recalled father hitting a wall. The recollections given by mother, father, daughter, and paternal grandfather varied in some details. Paternal grandfather reported the incident took place three years ago. Mother and father were arguing because father had been yelling at the children. When the social worker asked paternal grandfather where the children were when the incident took place, he stated: "They were in the room. I don't think they heard, but you could hear the hit." Mother recalled that the incident took place two or three years ago, when father had a disagreement with paternal grandparents, and that she and the children learned about it later. According to mother, this was not the only time father hit an object, but other incidents were much earlier. Father stated the incident occurred five to ten years ago, when he had walked away from a dispute, but was still upset. According to father, no one saw him do it, but people in the house could hear it, and he punched a divider, not a wall. He described it as a one-time incident and could not recall whether the dispute was with his wife or his parents.

9

Daughter said she remembers seeing the hole in the wall after the incident, but did not remember where in the house she was when it occurred. When asked how she knew that father caused the hole, she recalled that father was frustrated and walked outside, and "We kinda just knew." Paternal aunt was aware that father caused a hole hitting the kitchen door, but the incident occurred eight to ten years ago. She denied any domestic violence between mother and father, but noted that maternal grandmother hates father and has accused him of putting his hands on mother.

Describing the incident where father hit the car window, mother said it took place about 18 months earlier, when she and father were in a verbal argument; she got in the car to leave, and father hit the windshield but did not break it. Asked how she felt, she said: "It was scary. I would hope that he would never do that to my face, but being right there, it was kinda scary." She said the children did not witness the incident. The children denied knowing about the incident.

Everyone interviewed acknowledged that mother and father would engage in loud arguments that others could overhear, but denied any physical violence. Daughter said parents would argue in a different room, but the children could hear them arguing, and she would tell her siblings to close their ears. Samuel felt sad when he heard mother and father arguing, and he hid under the bed because he did not want to hear them. Asked about father's behavior when angry, the children said father would yell and then go

outside to calm down by doing something like going for a walk or playing basketball.

Mother described father as verbally aggressive and manipulative. She acknowledged that father has a temper. She said father has become more mellow since he stopped using drugs, and since the Department became involved with the family. Asked for a specific example of father's verbal manipulation, she said father would not take the children to the hospital to visit her. When he and paternal grandmother visited her in the hospital, they would make her feel bad and ask her when she was going to come home to take care of the children. Father would tell the children that mother had betrayed and abandoned them. Mother was undergoing chemotherapy and radiation for stage four breast cancer, and would need multiple surgeries. According to mother, father would manipulate the kids by questioning them when they wanted to stay with mother when she was still at maternal grandmother's home. Asked why she had returned to father if she had ongoing concerns, she responded: "I'm here because it's a lot less stressful for me and for my kids. Dealing with cancer and dealing with divorce is too much." She is giving father a year to improve their relationship.

Daughter still wanted counseling, and admitted that her concerns about her parent's relationship and the possibility of her parents separating sometimes prevented her from focusing at school. Father did not think his children needed counseling, and felt like consenting to

11

counseling might be used as ammunition against him in family court.

*Adjudication continued to consider voluntary case plan*

On the scheduled adjudication date in late January 2020, father's counsel asked for a continuance, advising the court that an assessment under section 301[4] might be appropriate. County counsel agreed, as did the children's counsel.

In February 2020, the dependency investigator spoke to father and explained the option of a section 301 contract, where the family would agree to participate in services, and the petition would be dismissed, but the Department would retain the option of reopening the court proceeding if the family was not compliant. Father responded that he spoke to his attorney, did not believe the Department's involvement was necessary, and planned to fight the case.

---

[4] Section 301 authorizes the Department to engage in voluntary, informal supervision where the social worker "determines that a child is within the jurisdiction of the juvenile court or will probably soon be within that jurisdiction." (§ 301, subd. (a).) Through such voluntary supervision, "the social worker shall attempt to ameliorate the situation that brings the child within, or creates the probability that the child will be within, the jurisdiction of Section 300 by providing or arranging to contract for all appropriate child welfare services . . . ." (*Ibid.*)

According to the Department, although father was making positive progress in substance use and anger control, it remained concerned that without continued involvement, problems would re-emerge. Mother reported father's positive changes started after the Department became involved, but father did not agree to the Department's continued involvement and he had only recently started to address the issues in counseling. In addition, mother and daughter had not yet started individual counseling, nor had the couple addressed their marital issues in couple's counseling. The Department recommended continued involvement to ensure the parents continued to receive support and reduce the risk of future abuse.

*Adjudication hearing*

The jurisdiction and disposition hearing took place on March 3, 2020. The court admitted into evidence the Department's reports and attachments, and a letter showing father's participation in a drug program.

Arguing in support of the jurisdictional allegations, the Department highlighted father's actions punching a hole in the wall and hitting mother's windshield with his fists (count b-4), arguing that without services and court supervision, the domestic violence would continue. Touching on counts b-3 and c-1, the Department argued that father's emotional state and his statements to the children amount to emotional manipulation warranting jurisdiction. Minor's

13

counsel started her argument by noting that the children wanted the court to know that now that the family was together, they wanted the petition dismissed. Nevertheless, taking into account father's failure or refusal to take responsibility for how his words and actions were causing harm to the children, minor's counsel asked the court to sustain either b-3 or b-4, but dismiss the substance use allegations under b-1 and b-2. Mother's attorney sought dismissal, arguing there was no current or ongoing risk. The court then asked father's attorney to focus his argument solely on count b-4. Father's attorney pointed out that count b-4 does not allege domestic violence, and there was no evidence of physical violence between the parents. Even for the two incidents of physical aggression, when father punched a wall and the car windshield, there was no evidence the children were present. The court permitted the Department to respond to father's argument, and the Department pointed out that the family was experiencing escalating verbal domestic violence, where the children could hear the parents arguing, and in light of the additional stresses posed by mother's illness, the children needed protection from the possibility of escalating disputes between mother and father.

The court then dismissed all counts except for b-4, which it sustained with written interlineations as follows: "b-4: On prior occasions, [father] engaged in violent assaultive behavior in the children's presence. On a prior occasion, the father struck the wall with the father's fists

14

and caused a hole in the wall.  Father has engaged in verbally assaultive language.  Father continues to engage in this behavior.  Father has refused to provide the appropriate counseling services to the children in order to ameliorate these concerns.  On a prior occasion, the father struck the car windshield with [the] father's fists.  Such violent conduct on the part of the father endangers the child[ren]'s physical and emotional health and safety and places the child[ren] at risk of serious physical harm, damage, and danger."  The court commented that domestic violence does not include hitting only, it also includes emotional abuse, control, and manipulation with no insight or acceptance of responsibility, and so it was sustaining the amended language for count b-4.

## DISCUSSION

Father's sole contention on appeal is that the evidence is inadequate to support dependency jurisdiction under section 300, subdivision (b)(1).  We disagree.

*Standard of review*

We review jurisdictional findings for substantial evidence.  (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.) "In doing so, we view the record in the light most favorable to the juvenile court's determinations, drawing all reasonable inferences from the evidence to support the

15

juvenile court's findings and orders.  Issues of fact and credibility are the province of the juvenile court and we neither reweigh the evidence nor exercise our independent judgment.  [Citation.]  But substantial evidence 'is not synonymous with any evidence.  [Citations.]  A decision supported by a mere scintilla of evidence need not be affirmed on appeal.  [Citation.]  . . .  "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record."  [Citation.]' [Citation.]"  (*Ibid.*)  Substantial evidence can be based on inferences that are grounded in logic and reason, but not speculation or conjecture alone.  (*In re Donovan L.* (2016) 244 Cal.App.4th 1075, 1093; *Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 420; *In re James R.* (2009) 176 Cal.App.4th 129, 135.)  To obtain reversal, the appealing party must show there is no evidence of a sufficiently substantial nature to support the findings or order.  (*In re D.C.* (2015) 243 Cal.App.4th 41, 52.)

*Governing law*

Dependency jurisdiction is warranted when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child." (§ 300, subd. (b)(1); *In re R.T.* (2017) 3 Cal.5th 622, 624.)  Section 300, subdivision (b)(1) "authorizes dependency jurisdiction

16

without a finding that a parent is at fault or blameworthy for her failure or inability to supervise or protect her child." (*In re R.T., supra,* at pp. 624, 627–633, 636–637, fn. 6 [disapproving *In re Precious D.* (2010) 189 Cal.App.4th 1251, and rejecting the reasoning requiring parental neglect for jurisdiction as set forth in *In re Rocco M.* (1991) 1 Cal.App.4th 814, 820].)  To sustain an allegation based on risk of future harm to the child, that risk must be shown to exist at the time the court makes the jurisdictional finding, but the court need not wait until the child is seriously injured to assume jurisdiction.  (*In re Yolanda L., supra,* 7 Cal.App.5th at p. 993.)  "To establish a defined risk of harm at the time of the hearing, there 'must be some reason beyond mere speculation to believe the alleged conduct will recur.  [Citation.]'  [Citation.]" (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1146; see *In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383–1384, quoting *In re S.O.* (2002) 103 Cal.App.4th 453, 461 ["[a] parent's "'[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue"'].)

If a child is otherwise safe and healthy, and the jurisdictional allegation is based on a single episode of endangering conduct, "'a juvenile court should consider the nature of the conduct and all surrounding circumstances.  It should also consider the present circumstances, which might include, among other things, evidence of the parent's current understanding of and attitude toward the past conduct that endangered a child, or participation in educational

programs, or other steps taken, by the parent to address the problematic conduct in the interim, and probationary support and supervision already being provided through the criminal courts that would help a parent avoid a recurrence of such an incident. The nature and circumstances of a single incident of harmful or potentially harmful conduct may be sufficient, in a particular case, to establish current risk depending upon present circumstances.' [Citation.] We must have a basis to conclude there is a substantial risk the parent's endangering behavior will recur." (*In re John M.* (2013) 217 Cal.App.4th 410, 418–419, quoting *In re J.N.* (2010) 181 Cal.App.4th 1010, 1025–1026.)

However, a court's determination of risk cannot be based upon speculation alone. Instead, section 300, subdivision (b), in other words, requires a showing of "*concrete* harm or risk of physical harm to the child." (*In re Rocco M.*, *supra*, 1 Cal.App.4th at p. 821, italics added.) "As appellate courts have repeatedly stressed, '"[s]ubdivision (b) means what it says. Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a *substantial* risk of *serious physical* harm or illness."' [Citations.]" (*In re Jesus M.* (2015) 235 Cal.App.4th 104, 111; accord, *In re T.V.* (2013) 217 Cal.App.4th 126, 133, quoting *In re R.V.* (2012) 208 Cal.App.4th 837, 843 ['"[t]he court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child"'].)

18

*Analysis*

We agree with father that, without more, the evidence of the single incident here of him punching a hole through the wall, two or three years earlier, would be insufficient to support dependency jurisdiction under subdivision (b)(1) of section 300.  But in deciding that the children were at present risk of harm, the court correctly considered the totality of the circumstances, which taken together, provided substantial evidence to support dependency jurisdiction.  Father's lengthy history of drug use, the incidents of physical aggression, ongoing heated verbal arguments between the parents even during mother's illness, and father's refusal to acknowledge the risks those factors posed to his children, when considered together, support the court's jurisdictional finding.

Father has an acknowledged, lengthy history of drug use for both marijuana and methamphetamine.  By his own admission, he used methamphetamine off and on for 13 years, and only stopped using two months before the Department's October 2019 investigation.  He also introduced mother to the drug, and was her "connect" (presumably meaning her source of drugs) when she was using.  In fact, mother said part of the reason for her moving in with maternal grandmother was to avoid the temptation when father was still using.  Father's recent participation in a substance abuse program likely led the court to conclude that there was insufficient evidence to support a finding of

current risk based on father's substance abuse, but that does not preclude the court from considering father's drug use history as a contributory factor in ongoing volatility in the parents' relationship.

Before her stage four breast cancer diagnosis, mother had been the children's primary caretaker. Her illness and her discovery of father's infidelity had caused mother to re-evaluate her role and her relationship with father. She described father as emotionally manipulative, accusing mother of abandoning him and threatening to kill himself if mother left. Rather than being supportive of his wife's very serious medical challenges, the record shows that father became more antagonistic, refusing to bring the children to the hospital to visit mother, threatening to call the police when Samuel chose to stay with mother rather than father, and making statements to the children that mother had abandoned them. Mother moved out for a time, and only moved back to minimize a stressful situation.

Although father had recently started making positive progress with substance abuse treatment and was attending counseling, he did not think his family needed help and therefore was unwilling to consent to counseling for the children. When father's attorney requested a continuance to consider a voluntary contract with the Department under section 301, father refused, stating it was unnecessary for the Department to be involved. In light of father's past conduct, which included violent outbursts, and father's refusal to acknowledge and accept the need to address how

his conduct affected the family, the court made a reasonable inference that absent court supervision, the family's problems were likely to escalate, placing the children at risk of serious physical harm. (*In re T.V.*, *supra*, 217 Cal.App.4th at p. 133.)

*Domestic violence and the definition of "abuse"*

Father also argues that the court erred in taking an expansive view of the meaning of domestic violence to include emotional abuse unaccompanied by physical violence, or the threat of such violence, against a person, rather than an object. Father cites to *S.M. v. E.P.* (2010) 184 Cal.App.4th 1249 to argue that father's behavior does not even amount to abuse as that term is defined in the Domestic Violence Protection Act, or DVPA (Fam. Code, § 6200 et seq.) The Department does not respond to this part of father's argument, but having considered the relevant case law, we find father's argument to be flawed in several respects. First, we disagree that the definition of abuse given in Family Code section 6203[5] can or should be

---

[5] The full text of Family Code section 6203 reads as follows:

"(a) For purposes of this act, 'abuse' means any of the following:

(1) To intentionally or recklessly cause or attempt to cause bodily injury.

(2) Sexual assault.

21

used as a proxy for whether a minor is at risk of harm under section 300, subdivision (b)(1) due to domestic violence in the home.  Although juvenile and family courts both handle matters involving domestic violence, we have previously noted that "the two courts operate under separate statutory schemes and serve distinct purposes.  (*In re Chantal S.* (1996) 13 Cal.4th 196, 200–201; *In re J.T.* (2014) 228 Cal.App.4th 953, 961.)  [¶]  '[D]ue to the separate and distinct purposes of the juvenile and family courts, many Family Code provisions do not apply in dependency proceedings.'  (*In re J.T.*, *supra*, 228 Cal.App.4th at p. 961.)" (*In re C.M.* (2019) 38 Cal.App.5th 101, 108.)  Father has provided no persuasive explanation for why a juvenile court, whose focus is on child protection, should use the definition of domestic violence provided in the Family Code.

Second, even if we were to agree—which we do not— that Family Code section 6203 governs whether there was sufficient evidence that the children were at substantial risk of serious harm, father's reliance on *S.M. v. E.P.*, *supra*, 184 Cal.App.4th 1249 is unwarranted in light of the broad definition of "abuse" under the DVPA.  In *S.M. v. E.P.*, the Court of Appeal did not explore the full parameters of

---

(3) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another.
(4) To engage in any behavior that has been or could be enjoined pursuant to Section 6320.
(b) Abuse is not limited to the actual infliction of physical injury or assault."

22

abusive conduct under the DVPA, and was instead narrowly focused on whether the limited facts found true in that case (pulling mother's covers off her in the middle of the night, refusing to allow mother to leave with their eight-month-old child after police had arrived at mother's request, and asking to be arrested) met the requirements for a restraining order that would also affect statutory presumptions for custody of the child. (*Id*. at pp. 1265–1266.)

Third, although the juvenile court here emphasized that domestic abuse includes emotional abuse, control, and manipulation with no insight or acceptance of responsibility, the evidence on the record indicates that such abuse was additional to incidents involving physical violence. In affirming the juvenile court's assertions of jurisdiction, we emphasize that our opinion is limited to the particular facts of the case before us, and we are not opining on whether verbal abuse without physical violence in other circumstances would or would not support a finding of dependency jurisdiction.

## DISPOSITION

The juvenile court's order is affirmed.


MOOR, J.

I concur:



RUBIN, P. J.

In re I.G. et al.
B305490


BAKER, J., Dissenting


This appeal is not about how to define domestic violence. Even where there *has* been an instance of physical violence between a minor's parents, that does not automatically mean dependency jurisdiction over the minor is proper. Rather, the question here, as in all such cases, is whether the minors themselves are at substantial risk of suffering serious physical harm.

The answer to that question on these facts is no. The parents in this case argued, sometimes vociferously, but unless we are prepared to bless an unprecedented expansion of the grounds on which the courts of this State may displace parental child rearing, those verbal arguments do not mean the minors were at substantial risk of serious physical harm. Insofar as the Department and the juvenile court relied on two instances when the father struck inanimate objects years earlier (outside the presence of the minors) as reason to assert dependency jurisdiction, those incidents are actually evidence indicating there is no current risk of harm to the minors; if the father's behavior did not "escalate" in the past two to three years, why would it now?

The majority's nebulous incantation of the "totality of the circumstances" cannot save the deficient jurisdiction finding, particularly when many of the circumstances the majority relies

on were not alleged in the dependency petition or were found to be an inadequate basis for jurisdiction by the juvenile court itself. The father in this case has parenting shortcomings, to be sure, but even under the deferential substantial evidence standard, there is insufficient evidence the minors are at substantial risk of serious physical harm for the reason alleged in the sole count of the dependency petition that the juvenile court found true.  I would accordingly reverse.


BAKER, J.